## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 11 2019, 9:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kyle K. Dugger
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:

N. P. (Minor Child)

And

J. O. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of
Child Services,

*Appellee-Petitioner.*

December 11, 2019

Court of Appeals Case No.
19A-JC-1706

Appeal from the Monroe Circuit
Court

The Honorable Holly M. Harvey,
Judge

Trial Court Cause No.
53C06-1902-JC-99

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, J.O. (Father), appeals the trial court's Order declaring his minor child, N.P. (Child), to be a Child in Need of Services (CHINS) but returning Child to Father's care.

We affirm.

# ISSUE

Father presents two issues on appeal, which we consolidate and restate as the following single issue: Whether the trial court's findings and conclusions that Child is an in-home CHINS were clearly erroneous.

# FACTS AND PROCEDURAL HISTORY

Prior to February 18, 2019, both Mother[1] and Father abused opioids and had sought treatment at Transitions in Bloomington, Indiana. Father received daily doses of Suboxone. Father and Mother are both learning disabled. Child was born on February 18, 2019. Although Mother had other children, this was Father's first child.

After Child's birth, the nurse attending to the family provided Father with education on how to properly feed and hold the newborn. In the nurse's experience, most parents were able to learn these skills after being told once or

---

[1] The trial court found Child to be a CHINS as to Mother and Father. Mother does not participate in this appeal. We will confine our analysis as much as possible to the facts and issues which concern Father, although the trial court entered many of the same findings and conclusions as to both parents.

twice. Despite repeatedly providing Father with this information, the nurse observed Father feeding Child too frequently, holding Child's bottle at too acute an angle such that Child could not breathe properly, and holding Child such that his head was not adequately supported. On February 20, 2019, the Department of Child Services (DCS) received a report of possible neglect due to Mother's drug use and Mother and Father's inability to properly care for Child. DCS Family Case Manager Hannah Nunn (FCM Nunn) investigated. FCM Nunn interviewed Mother and Father in the hospital, and both denied active drug use. FCM Nunn drug tested Mother and Father and, after the test, offered them substance abuse treatment, therapy, and home-based case management services. Mother and Father declined the offered services. Although FCM Nunn had developed a safety plan for Child with Mother and Father's input, based on their refusal of services and what FCM Nunn had observed, FCM Nunn was concerned that the safety plan for Child would not be followed.

[6] FCM Nunn determined that Child should be detained to ensure his safety. When FCM Nunn re-entered the hospital room to inform Mother and Father that Child would be detained, Mother was holding Child. Upon learning that Child was to be detained, Father removed Child from Mother's arms and held Child with one arm while using the other arm to attempt to keep FCM Nunn and the police officers escorting her from removing Child. Father cursed FCM Nunn and the officers and yelled at them to "get out." (Transcript p. 27). Father did not have full control of Child's body, and he again allowed Child's

head to be unsupported while this incident occurred. Child was eventually safely detained and was placed outside of Father and Mother's care.

[7]     On February 22, 2019, DCS filed a petition, alleging Child to be a CHINS based on its allegations that Child's

> physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of [Child's] parent . . . to supply [Child] with necessary food, clothing, shelter, medical care, education, or supervision[.]

(Appellant's App. Vol. II, p. 19). DCS more specifically alleged that Father was currently on Suboxone treatment and had engaged in the physically aggressive incident at the hospital while holding Child; Father had failed to demonstrate that he could meet Child's basic needs, as he overfed and improperly fed Child, did not know how to properly hold Child, did not know how to secure Child in his car seat, and was not successful in receiving parenting instructions despite repetition of instruction; and Father had a prior substantiated allegation of sexual abuse of a child in 2014. DCS provided Father supervised visitation with Child for two hours at a time, twice a week. Father was to be drug tested by DCS as he continued treatment through Transitions. DCS provided Father with home-based counseling to work on parenting skills and completing an application for "BDDS".[2] (Tr. p. 87).

---

[2] Although the precise nature of BDDS is unclear from the record, it appears to be a long-term service provider for those with disabilities.

[8] On April 17, 2019, the trial court began a two-day hearing on the CHINS petition. Father had been consistently exercising supervised parenting time and came adequately prepared. None of the service providers who testified at the hearing had concerns that Father did not know how to feed and hold Child or put Child in his car seat. On the Monday preceding the CHINS hearing, DCS had moved supervised parenting time from a public facility to Father and Mother's home. The parenting-time supervisor testified that, if Father were to receive more parenting-time with Child, it would be beneficial for him to receive more services to work on his parenting skills. Father had participated in two sessions totaling under two hours of parenting education classes. The home-based case manager assigned to Child testified that one of the goals for Father was to increase the amount of parenting education he was receiving.

[9] Father's home-based counselor provided the following updates on Father's progress in services. Father had not provided a sample for four of the eight DCS requested drug screens, even though he was aware that a missed screen was presumed to be positive for illegal substances. Father had missed the last two sessions in April with his home-based counselor, who felt that progress was challenging if interrupted by missed sessions. Father's home-based counselor had worked with Father to complete his BDDS application, but the application could not be completed until Father selected a new primary care physician, which Father had not yet done because he had missed his last two sessions. The home-based counselor was working with Father on budgeting and accessing community resources. Father and Mother had decided not to seek

employment in the hope that Child would be returned to them. Father and Mother received disability benefits but spent most of their income before mid-month and were forced to access community food resources. Father's home-based counselor felt that Father would benefit from continued services to work on goals.

[10] Father admitted at the CHINS hearings that he had last abused prescription medication in December of 2018 and that he was being actively treated at Transitions at the time of this last use. Father felt that the parenting education services he was undertaking through DCS were helpful and that he would continue to learn from them. Father asked the trial court for an "in-home CHINS." (Tr. p. 134). The Court Appointed Special Advocate (CASA) assigned to Child testified that Father continued to need assistance caring for his young son, the current services offered to him appeared to be assisting him, and that the CASA saw no reason "not to continue those services." (Tr. p. 141).

[11] On May 28, 2019, the trial court issued its Order declaring Child to be an in-home CHINS. The trial court found that Father had initially demonstrated a lack of ability to properly feed and hold Child and that he had engaged in the physically aggressive incident in the hospital while holding Child. The trial court entered the following relevant findings:

> a. On 2/20/19, [Father] stated he is currently on a Suboxone treatment program through Bloomington Transitions. This

treatment was initiated after the [] parties' involvement in other DCS cases.

* * * *

h.  [Father] initially denied services from DCS at the hospital.

i.  [Father] demonstrate[s] an inability to retain information pertaining to the care and safety of [Child] in the short term that has only improved with the provision of services, as observed by the visit supervisor and home[-]based case managers.  [Father] require[s] additional training, education, and assistance in budgeting, time management and parent education to ensure [Child's] safety in their care.  These demonstrated inabilities to provide adequate care, along with [Father's] substantiated prior drug use and current treatment for the same, seriously endangers [Child's] physical or mental condition.

j.  [Child] needs care that [Father has] not yet demonstrated an independent ability to provide.

* * * *

o.  [Father's] previous denial of services and lack of insight on the need for additional training and guidance, in addition to the likely denial of treatment without court order demonstrates [sic] that services necessary for [Child's] care are unlikely to be provided or accepted without the coercive intervention of the [c]ourt.

(Appellant's App. Vol. II, pp. 36, 37).  The trial court found that it was in Child's best interests to place Child back in Mother and Father's home but that "continued DCS wardship is needed to ensure that both parents maintain

sobriety, receive necessary mental health care and home based services to ensure the safety of [Child.]" (Appellant's App. Vol. II, p. 38). The trial court also entered a number of findings regarding Father's participation in substance abuse treatment, his demonstration of love and affection for Child, his ability to learn parenting skills "with guidance," the lack of ongoing concerns regarding Father's ability to feed and hold Child, and the appropriateness of Father's home for Child. The trial court concluded that

> [a]dditional home based care management is required to improve [Father's] ability to maintain [his] budget and time management skills necessary to fully care for a child, in absence of other disability services that may ultimately take the place of DCS services.

(Appellant's App. Vol. II, p. 38).

[12] On June 18, 2019, the trial court held a dispositional hearing after which it entered an order directing that Child should remain in-home with supervision by DCS to ensure that Child had a home free from substance abuse and neglect. The trial court also ordered that participation by Father in a plan for the care of Child was necessary to ensure Child's safety.

[13] Father now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Father challenges the evidence supporting the trial court's findings of fact and conclusions of law that Child is a CHINS. Our standard of review of a trial court's CHINS determination is well-settled: we do not reweigh the evidence or judge witness credibility. *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014). We consider only the evidence which supports the trial court's decision and the reasonable inferences to be drawn from that evidence. *Id*. at 1287. In addition, where, as here, the trial court has entered findings of fact and conclusions of law, we exercise a two-tiered review. *Matter of K.P.G.*, 99 N.E.3d 677, 681 (Ind. Ct. App. 2018), *trans. denied*. First, we consider whether the evidence supports the findings, and, second, we determine whether the findings support the judgment. *Id*. We will reverse a trial court's CHINS determination only if it is clearly erroneous and a review of the record leaves us firmly convinced that a mistake was made. *Id*. A CHINS determination is clearly erroneous "if the record facts do not support the findings or if it applies the wrong legal standard to properly found facts." *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997) (internal quotation marks omitted). DCS was required to prove that Child was a CHINS by a preponderance of the evidence. *See* Ind. Code § 31-34-12-3.

## II. *Findings of Fact*

Father asserts that DCS did not prove various factual allegations contained in the CHINS petition, which we will address as challenges to the evidence supporting the factual findings entered by the trial court. Because Mother is not

a party to this appeal, we will not address Father's claims pertaining to her, such as his argument that DCS failed to prove that Mother had tested positive for methamphetamine, amphetamines and cannabinoids. Father asserts that he "challenges every finding the trial court entered in its order." (Appellant's Br. 12). We agree with DCS that the majority of this argument is waived for failure to make a cogent argument. *See* Ind. Appellate Rule 46(A)(8)(a) (requiring that each argument advanced must be supported by citation to authority and the part of the Record on Appeal relied upon); *see also N.C. v. Ind. Dep't of Child Servs.*, 56 N.E.3d 65, 69 (Ind. Ct. App. 2016) (holding that a party waives issues that are not supported by cogent argument including citations to the record and to legal authority), *trans. denied*.

[16] Father specifically challenges the trial court's findings that he allowed Child's head to "bobble around and drop," that Child "spit up profusely" as a result of Father's overfeeding, that he had a prior DCS history, and that he had "substantiated prior drug use and current treatment for the same[.]" (Appellant's App. Vol. II, p. 37). These findings were supported, respectively, by testimony by FCM Nunn that she had witnessed Father leave Child's head unsupported which allowed his head to bobble and drop, the attending nurse's testimony that she had observed Child spit up abnormally large amounts which was a sign of overfeeding, a family case manager's testimony that Father had a prior DCS substantiation in 2014, and Father's admissions to FCM Nunn and at trial that he had abused prescription medication and was currently undergoing Suboxone treatment at Transitions. Because evidence in the record

supported these findings, we conclude that they were not clearly erroneous. *See Yanoff,* 688 N.E.2d at 1262.

[17] Father also specifically challenges the evidence supporting the trial court's findings regarding his alleged inability to place Child securely in his car seat and inability to use proper swaddling techniques. The trial court entered the following finding that mentioned car seat use and swaddling:

> d. [Father] received bedside training in regards to proper bottle feeding, swaddling, safe sleep and car seat procedures. When holding [Child], [Father] allowed his head to bobble around and drop. [Father was] not able to apply training information to caring for [Child] and could not repeat back information given to [him].

(Appellant's App. Vol. II, p. 37). FCM Nunn testified that Father received training by hospital staff on how to use Child's car seat but that he was unable to place Child properly in the seat and had asked her to do it. Thus, the finding regarding the use of the car seat was also supported by the evidence and was not clearly erroneous. *See Yanoff,* 688 N.E.2d at 1262. However, we agree with Father that there is no evidence in the record regarding anyone instructing Father on swaddling or that it was an issue in this case whatsoever. Be that as it may, the trial court's mention of swaddling was part of a larger finding that Father demonstrated an inability to retain instruction on Child's care, a finding that was supported by other evidence that Father was initially unable to learn from instruction on feeding Child, holding Child, and car seat use. We conclude, therefore, that given the other findings supporting the judgment, this

one unsupported aspect of the trial court's finding does not undermine the trial court's CHINS determination.

### III. *Conclusions of Law*

[18]     Father next challenges the trial court's conclusions of law supporting its determination that Child is a CHINS. DCS sought to have Child adjudicated a CHINS under Indiana Code section 31-34-1-1, which provides as follows:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision . . . and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> (A) the child is not receiving; and
>
> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Thus, an adjudication under this section "requires three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d at 1287. Requiring that DCS show that a child's needs are unlikely to be met without the

intervention of the court "guards against unwarranted State interference in family life, reserving that intrusion for families 'where parents lack the *ability* to provide for their children,' not merely where they 'encounter *difficulty* in meeting a child's needs.'" *Id.* (quoting *Lake Cnty. Div. of Family & Children Servs. v. Charlton*, 631 N.E.2d 526, 528 (Ind. Ct. App. 1994)). In rendering a CHINS determination, the trial court considers the family's condition not just when the petition was filed, but also when the petition is heard. *In re S.D.*, 2 N.E.3d at 1290.

[19] We begin by observing that at the CHINS fact-finding hearing, in response to a question from his counsel about what he would like the trial court to do in this case, Father responded, "I want to do an in-home CHINS." (Tr. p. 134). Father also stated during his testimony that he had learned from the parenting education that he had received and that he felt that he would continue to learn from those services. The trial court granted Father's request, finding Child to be a CHINS but returning Child to Father's care prior to the June 18, 2019, dispositional hearing. Although we acknowledge that Father did not formally admit the allegations contained in the CHINS petition, we find that, under the circumstances of this case, the doctrine of invited error militates in favor of upholding the trial court's conclusion that Child is a CHINS. *See C.T. v. Marion Cnty. Dep't of Child Servs.*, 896 N.E.2d 571, 588 (Ind. Ct. App. 2008) (holding that the doctrine of invited error provides that a party may not take advantage of an error that she commits or invites), *trans. denied*.

[20] We also find that, contrary to the arguments that Father now offers on appeal, sufficient evidence supported the trial court's conclusions that at the time of the CHINS hearing, Child was endangered and the coercive intervention of the State was necessary to ensure Child's proper care. The trial court ultimately concluded that "[Father's] demonstrated inabilities to provide adequate care, along with [Father's] substantiated prior drug use and current treatment for the same, seriously endangers [Child's] physical or mental condition." (Appellant's App. Vol. II, p. 37). In support of this conclusion, the trial court found that Father had demonstrated an inability to retain parenting information that had only improved with supervised parenting time and home-based counseling, Father required additional services in budgeting and parenting to ensure Child's safety, and Father had not yet demonstrated an independent ability to provide care for Child.

[21] Although we agree with Father's assertion that many of DCS's initial concerns regarding Father's ability to parent, primarily the holding and feeding of Child, had been addressed by the time of the CHINS hearing, we cannot conclude that the trial court's conclusion that Child continued to be endangered at the time of the CHINS hearing was clearly erroneous. As Child grew, his needs would also change. Father was to be evaluated for his learning disability as part of the services offered to him after the CHINS determination. Father's demonstrated inability to retain parenting information and his poor impulse control, as shown by his conduct when DCS attempted to remove Child, supported a conclusion that he required supervision and instruction to continue to parent Child

effectively and to ensure Child's care. In addition, Father had elected not to pursue employment but was unable to budget his disability benefits appropriately to cover expenses, which placed his financial ability to provide for Child's basic needs in jeopardy. Father had also missed four drug screens in the two months between the filing of the CHINS petition and the CHINS hearings. Because these missed screens were presumed to be positive, there was evidence to support an inference that Father's drug use was ongoing, further endangering Child.

[22] Father argues that the trial court's conclusions were not supported by the evidence because he had participated in services, had addressed DCS's concerns, he did not injure Child during the incident in the hospital in which he attempted to thwart removal, and he had demonstrated that he was caring and loving toward Child. However, these arguments merely invite us to consider evidence and inferences that do not support the trial court's determination, which is contrary to our standard of review. *See In re S.D.*, 2 N.E.3d at 1286.

[23] We similarly find that the trial court's conclusion that State intervention continued to be necessary was supported by the evidence. Father was only partially compliant on his substance abuse treatment, as he missed four of the eight screens offered to him before the CHINS hearings. Father had also missed his last two sessions with his home-based counselor, who felt that this inconsistency in attendance prevented progress. For example, Father had completed some of his BDDS application but had yet to select a primary care physician, a necessary last step to finish the application which had not taken

place because Father had missed his last two sessions. Father's home-based counselor opined at the CHINS hearing that Father continued to need the counselor's involvement to work on goals. The parenting-time supervisor also expressed her opinion at the hearing that, if Father were to receive additional parenting time with Child, he would benefit from additional parenting education. Child's CASA felt that continued State intervention was necessary for Father and beneficial to Child. Father himself stated during his testimony at the CHINS hearing that he had learned from the parenting education that he had received and that he felt that he would continue to learn from those services.

[24] Father likens his case to *In re D.J.*, 68 N.E.3d 574, 580-81 (Ind. 2017), in which our supreme court found insufficient evidence supporting the trial court's conclusion that continued State intervention was necessary due to parents' progress in services and their demonstrated willingness to be compliant. However, we find that case to be readily distinguishable from the instant case because in *In re D.J.*, the parents had satisfactorily completed all DCS-offered services by the time of the fact-finding hearing. *Id*. at 581. As set forth above, Father was not entirely compliant with either his substance abuse or his home-based services prior to the fact-finding hearings. In light of the fact that Father was not entirely compliant with his substance abuse and home-based services, the need for continued State intervention expressed by the home-based counselor, the parenting-time supervisor, and the CASA, and Father's own statements, we conclude that there was evidence supporting the trial court's

conclusion that continued State intervention was necessary, and, therefore, that conclusion was not clearly erroneous. *See Yanoff*, 688 N.E.2d at 1262.

# CONCLUSION

Based on the foregoing, we conclude that the trial court's findings and conclusions that Child was an in-home CHINS were supported by the evidence and, therefore, were not clearly erroneous.

Affirmed.

Baker, J. and Brown, J. concur